### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

**DANIEL RAY CLARK**                                                                 **PLAINTIFF**

**VERSUS**                                             **CIVIL ACTION NO. 1:13cv116-HSO-RHW**

**CAROLYN W. COLVIN**
**ACTING COMMISSIONER OF SOCIAL SECURITY**                     **DEFENDANT**

### REPORT AND RECOMMENDATION

Pursuant to 42 U.S.C. § 405(g), Daniel Ray Clark filed this action on April 11, 2013,

seeking judicial review of the denial of his claim for Social Security disability benefits and

supplemental security income.  On April 15, 2013, the Court entered [4] an order advising the

parties of the briefing requirements and deadlines applicable to the case, including Plaintiff's

duty to file a brief within 30 days after the Commissioner answered the complaint and filed the

transcript of the record.  The order further advised of the matters which must be contained in the

brief.  On July 23, 2013, the Commissioner answered and filed the transcript of the

administrative record.  Clark failed to file a memorandum as required by order [4], and on

September 17, 2013, the Court entered [16] an order requiring Plaintiff to show cause why the

case should not be dismissed.  Clark responded on September 26, 2013 with [17] a request for

additional time to file his memorandum, which the Court granted by order [18] entered the

following day.  Clark filed [19] his memorandum on October 25, 2013, and the Commissioner

filed his memorandum in opposition on December 11, 2013.  Clark filed no reply and the matter

is ripe for ruling.

On January 26, 2010 Clark filed application for supplemental security income (SSI) and

disability insurance benefits, alleging he became disabled December 11, 2009 at age 47.  [15, pp.

81-82, 120-133]  The claim was denied initially on May 28, 2010, and upon reconsideration on

August 16, 2010.  [15, pp. 85-90, 94-96]  Clark requested and was granted a hearing which was

conducted by Administrative Law Judge (ALJ) Charles C. Pearce on November 28, 2011.  Clark

was represented by counsel at the hearing.  [15, pp. 26-61]  Clark testified at the hearing, as did

vocational expert Robert E. Walker, Jr.

At the time of the hearing, Clark was 49 years old and married, with a 23-year-old son

living with him and his wife.  Clark has an eighth grade education.[1]  He testified that he, his wife

and son work together, doing handyman jobs such as painting and cleaning, and that he worked

three or four days a week, but less than 40 hours a week.[2]  The three normally work on rental

properties for a property manager in Ocean Springs, MS.  Clark testified their combined income

was "$11,000 last year."[3]  He testified he did not work for a year after his surgery,[4] then when he

tried to work a blood vessel in his eye burst and he began having pain in his right shoulder, so he

filed for disability (in January 2010).  Clark stated after Hurricane Katrina,[5] he received a

$57,000 federal grant and that is what they lived on after his surgery.  Clark's prior work was

installing automobile windshield glass for almost 27 years.  He quit that job after Hurricane

Katrina because his employer was pressuring him to work more and to work on Saturdays for the

same pay.  He began working for himself, and has since installed some insulated windows in

houses, but no auto glass because he works out of his house.

A work history report in the record dated May 22, 2010 indicates Clark was owner of a

glass and construction business from March 2006 until December 2009, working 6-8 hours a day

five days a week, at a pay rate of $600 per week.  This job involved walking up to four hours a

---

[1]According to his attorney, Clark has a ninth grade education. [15, p. 201]
[2]Clark stated in other documents that he stopped working December 11, 2009.  See, *e.g.*, [15, p. 164]
[3]Clark stated his gross income was $13,800 in 2010, and net income of $7,207.29 for himself, his wife and son.
Clark filed no income tax return for that year. [15, p. 53-56]
[4]The transcript of administrative proceedings indicates Clark had triple by-pass surgery in August 2007. [15, pp. 169, 202, 211-229]
[5]Hurricane Katrina struck the Mississippi Gulf Coast August 29, 2005.

2

day, standing up to five hours a day; sitting, climbing, kneeling, crouching, crawling, handling

big objects and reaching up to an hour a day, stooping three to four hours a day and writing or

handling small objects up to six hours a day.  He lifted and carried glass, wood, sheetrock, 5-

gallon paint buckets, scaffolding and ladders up to 100 feet every other day, with the heaviest

weight lifted being 50 pounds, and frequent lifting of 25 pounds.  This job description is very

similar to that of his prior jobs from 1982 to 2005 as an auto glass tech working eight hours a

day five days a week at a pay rate of $15 to $18 per hour.  [15, p. 179-184]

A vocational analysis worksheet dated May 28, 2010 indicated no established postural,

manipulative, visual or communicative limitations; environmental limitations of avoiding

concentrated exposure to extreme cold and heat, poorly ventilated areas, and hazards such as

machinery and heights; and exertional limitations of lifting a maximum of twenty pounds or ten

pounds frequently, and standing, sitting and walking six hours a day.  This document concluded

that Clark should adjust to other work.  [15, pp. 188-90]

Clark described his medical conditions as inability to see out of his left eye which laser

surgery failed to remedy,[6] and a torn right shoulder "rotor (*sic*) cuff" for two years which has

worsened over time.  He is able to watch television and read, and as an unpaid interim church

pastor for close to two years, he testified he does a lot of studying.  He sometimes wears a patch

on his left eye to watch television.  Clark testified the shoulder and eye problems started around

the same time in December or January.  He claims the rotator cuff hurts all the time now, and

interferes with his sleep, and he takes ten Aleves during the day and a pain pill at night.  Clark

testified he still worked with his wife and son, but his wife does most of the painting because he

cannot reach overhead for very long.  He testified his main problem is weakness and shortness of

---

[6]Clark later testified his vision in the left eye is like "looking through a Coke bottle with muddy water in it," and he cannot see well at night.  He thinks vision problems affect his balance. [15, pp. 46, 48, 148-9]

breath which he has had since his heart surgery.  Clark attributes these problems to some extent

to his inability to exercise on the treadmill because his left hip goes out.  Clark testified he also

has diabetes for which he takes "about five shots a day."  He stated he has been taking injections

for diabetes since he was 21, and the shots "pretty much" control the diabetes.  He testified he

has had numbness in his legs, feet and hands for three or four years.  He takes out the garbage,

but his wife does most everything else around the house.

Initial follow-up after his 2007 bypass surgery indicated Clark was doing well.  [15, pp.

226-28]  Dr. Mahmoud Zayed began seeing Clark on July 23, 2007 on referral by Dr. Striegel.  It

was Dr. Mahmoud who referred Clark for the bypass surgery in August 2007, and who treated

him post-surgery.  His records indicate that on September 11, 2007, Clark was doing well, "just a

little fatigued still." [15, p. 234]  On October 11, 2007, Dr. Mahmoud indicated Clark was

"doing well, feeling stronger every day." [15, p. 233] On April 8, 2008, Clark reported "severe

soreness in his chest after he worked in his yard for a couple of days in a row."  Dr. Mahmoud's

impression was the chest wall tenderness was "most likely secondary to repeated trauma from

tilling in his yard." [15, p. 232]  On October 2, 2008, Clark was doing well with no complaints of

chest pain.  He was having some muscle aches and pains from Lipitor and he was switched to

Crestor and "is feeling better." [15, p. 231]  On May 11, 2009, Clark complained of muscle

aches, pains, and joint pains involving his shoulders and hips.  [15, p. 230]

Singing River Hospital records show Clark was seen February 17, 2008 for complaints of

mild headache following a motor vehicle accident that day when the vehicle he was driving was

rear-ended.  At that time he denied visual changes, trauma, and cardiovascular/respiratory

problems, reporting only neck ache and mild headache.  [15, pp. 250]  Clark went to the hospital

for complaints of eye irritation on January 4, 2010, and again on January 5, 2010 for subjective

visual disturbance.  Tests revealed findings of mild partially calcified atherosclerotic disease

within the right carotid bulb.  The January 4, 2010 emergency room record reports a history of

blurry vision to the left eye that started Saturday,[7] which Clark described as floaters, just cloudy

vision in his left eye, but he could see and reported "no pain whatsoever."   On ophthalmoscopic

exam, it appeared there was some blood in the posterior chamber of his left eye, the cornea was

normal, he had good pupillary reflex and no pain.  The emergency room physician scheduled

him an appointment with Dr. Michael Seymour the following day.  [15, pp. 241-247]  Clark saw

Dr. H.C. Semple January 12, 2010, who diagnosed him with "background diabetic retinopathy,

right eye and proliferative diabetic retinopathy, left eye with vitreous hemorrhage.  Dr. Semple

stated Clark underwent pan retinal photocoagulation therapy in his left eye and, "His vision

stabilized in the 20/20 - 20/30 range."  In September 2010, Clark had a recurrent vitreous

hemorrhage in his left eye, and Dr. Semple recommended further therapy.  [15, pp. 290-295].

As of March 20, 2010, Clark stated since his heart surgery in 2007 he has less strength,

his breathing is not as good as before and he has no strength in his arms.  He can walk about 50

feet before leg and hip pain make him stop, and he can climb 25-30 steps before he has to stop

because his legs get tired and cramp.  He also stated he exercises every other day, doing 20-30

minutes on the treadmill, but most of the time after five minutes his left hip begins to hurt and he

stops.  He described chest pain as pressure and sticking and stated the pain affects his neck, arm,

shoulder and throat, and his right shoulder has hurt for the last six weeks at night when he lies

down.  He has chest discomfort once or twice a week, and states to relieve it he takes deep

breaths.  These documents state he has never been hospitalized for a heart attack, had never had

a heart study involving injection of dye into an artery, had never had an exercise EKG or an

echocardiogram.  [15, pp. 175-178]  A March 30, 2010 chest xray showed no enlargement of the

---

[7]Perhaps January 2, 2010 since January 4, 2010 was a Monday.

heart, unremarkable vascularity, no evidence of CHF, effusions or pneumothorax, and "no evidence for acute infiltrate or significant interval change." [15, pp. 255, 311]  A May 10, 2010 EKG showed sinus rhythm, no ST or T-wave abnormalities and no new EKG changes with stress.  A stress test of the same date showed no stress-induced arrhythmias, blunted heart rate and normal blood pressure response to exercise, and fair to good exercise tolerance.  [15, p. 259]

A residual functional capacity assessment dated May 19, 2010, indicated Clark could occasionally lift/carry twenty pounds, frequently lift/carry ten pounds, stand/walk about six hours in an eight-hour work day, sit about six hours a day, and had no limitations with respect to push/pull other than those shown for lift/carry.  There were no postural, manipulative, visual, or communicative limitations established, and the only environmental limitations were to avoid concentrated exposure to extreme cold and heat, dust, fumes or gases, and hazards such as machinery and heights.  This assessment also found Clark capable of more physical exertion than he alleged, and noted, "Credibility partial." [15, pp. 280-287]  Judge Pearce considered this report, but did not give it controlling weight because the examiner did not consider Clark's vision loss, obesity and right rotator cuff tear as severe impairments, and there was neither adequate explanation nor medical opinion from a treating source for the restrictions on dust, fumes or gases.  [15, p. 20]

Dr. Striegel saw Clark January 14, 2011 for refills of medications for shoulder pain, rotator cuff syndrome.  By history, Clark had received three shots at Urgent Care six months earlier which lasted for two months, but the pain had since returned.  [15, pp. 301]  An MRI of Clark's right shoulder performed  March 3, 2011 indicated "a full thickness tear at the distal supraspinatus tendon at its insertion site with associated fluid in the subacromion-subdeltoid bursa." [15, pp. 296-7, 310]  Dr. Arthur Black saw Clark on April 12, 2011 for complaints of

right shoulder pain for a year and a half, which started as pain and soreness in the shoulder rather than any particular injury.  By history, Clark's pain was initially at night, but then became all the time.  Dr. Black reviewed the MRI and found it shows a full thickness medium rotator cuff tear.  Dr. Black advised Clark to work on his range of motion with exercises, offered him a cortisone shot which Clark declined, and urged Clark to go ahead and set up surgery.  [15, pp. 299-300]  On November 8, 2011, Clark gave Dr. Striegel a history of having seen Dr. Black "re: shoulder, referred to Jackson, MS; denied; has poison ivy also." [15, p. 309]

Dr. Striegel provided a physical medical source statement dated December 29, 2011, after the ALJ issued his decision.[8]  Dr. Striegel noted he has seen Clark since 1983, for diagnoses of Type I Diabetes, HBP, chol., diabetic neuropathy, torn rotator cuff, left hip pain and blind left eye, and symptoms of chronic pain right shoulder and left hip, anxiety/worry.  Dr. Striegel states Clark's pain or other symptoms are constantly severe enough to interfere with attention and concentration; that he is severely limited in the ability to deal with work stress; that he is unable to walk any city blocks without rest, can continuously sit 15 minutes at a time, and stand 30 minutes at a time; he can sit/stand/walk less than two hours in an eight-hour work day; he needs a job which permits shifting positions at-will from sitting, standing or walking, and allows him to take unscheduled breaks every hour and rest 10 minutes before returning to work.  Dr. Striegel further states with prolonged sitting, Clark's legs should be elevated two feet, and he states Clark cannot work an eight hour job.  He indicates Clark can never lift/carry even less than ten pounds, that he has significant limitations in doing repetitive reaching, handling or fingering and that he cannot use right hands/fingers/arm at all, and left only 80% of an eight hour day.  He estimates

---

[8]Dr. Striegel's medical source statement was received and considered by the Appeals Council, which understandably held that it  did not provide a basis for changing the Administrative Law Judge's decision. [15, p. 6]  Dr. Striegel's opinions indicate Clark cannot do things which Clark himself testified he could do, *e.g.*, use his right arm to some extent albeit with pain.

Clark's impairments/treatment would cause him to miss work more than three times a month. [15, pp. 314-318]

Vocational expert Robert E. Walker, Jr. testified at the hearing that Clark's windshield installation job is classified as exertionally medium, with a skill level of 4 on a 1 to 9 scale for skills, and he opined that Clark could not return to that work.  Asked to assume a person of Clark's age and educational level, with past work as a glass installer, who has a light residual functional capacity which does not expose him to unprotected heights or hazardous machinery or require climbing ladders or scaffolds, with occasional balancing and occasional reaching overhead with his dominant arm, who cannot work in a poorly-lighted work environment or operate a motor vehicle at night, Walker stated that even though Clark would no longer be able to work as a glass installer, there would be some unskilled work that a person with those restrictions could perform, *e.g.*, storage rental clerk, information booth clerk, and ticket seller. Walker testified such jobs exist in the national economy.  Walker stated that all jobs would be eliminated if the person has pain which would prevent his concentrating on even simple work tasks for eight hours a day, five days a week. [15, pp. 56-58]  On December 9, 2011, ALJ Pearce issued his eight-page decision concluding, from the entire record, that Clark has the residual functional capacity to perform light work with certain restrictions, and is thus not disabled as defined by the Act.  The Appeals Council denied Clark's request for review on February 8, 2013 [15, pp. 5-9], prompting Clark to file this action for judicial review.

### Standard of Review

Judicial review of a final decision of the Commissioner is limited to determining whether substantial record evidence supports the Commissioner's factual findings, and whether such findings are reached through the application of correct legal standards.  *Perez v. Barnhart*, 415

F.3d 457, 461 (5th Cir. 2005); *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994).  Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but

less than a preponderance.  *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000); *Villa v. Sullivan*,

895 F.2d 1019, 1022 (5th Cir. 1990).  The Court reviews the entire record to determine whether

substantial evidence supports the Commissioner's decision.  *Villa*, 895 F. 2d at 1022.  Credibility

of witnesses and conflicts in the evidence are issues for resolution by the Commissioner, not the

Court.  It is not the Court's prerogative to substitute its judgment for that of the Commissioner or

to re-weigh the evidence.  *Harris v. Apfel*, 209 F.3d at 417(quoting *Ripley v. Chater*, 67 F.3d

552, 555 (5th Cir. 1995)); *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988)(a finding of

"no substantial evidence" is appropriate only if no credible evidentiary choices or medical

findings support the decision); *Selders v. Sullivan*, 914 F. 2d 614, 617 (5th Cir. 1990).  Factual

findings supported by substantial record evidence are conclusive and must be upheld.  *Estate of*

*Morris v. Shalala*, 207 F. 3d 744, 745 (5th Cir. 2000); *Martinez v.  Chater*, 64 F.3d 172, 173 (5th

Cir. 1995).  The Court may reverse a decision of the Commissioner if it is based upon faulty

legal analysis, but should accept the Commissioner's legal conclusions if they are within

reasonable meanings of the statutory or regulatory language.  *Chevron, U.S.A., Inc. v. Natural*

*Resources Defense Council*, 467 U.S. 837, 841-44 (1984).  Absent a finding that the decision is

unsupported by substantial evidence or that the Commissioner applied an incorrect legal

standard, the Court must affirm the Commissioner's decision.  *Boyd v. Apfel*, 239 F.3d 698, 704

(5th Cir. 2001).

Analysis

In his December 9, 2011 decision, Judge Pearce applied the correct law for determining disability – the five-step sequential evaluation process set out at 20 C.F.R. 404.1520(a)(i-v) and 416.920(a).  Step one requires a determination whether the claimant is engaging in substantial gainful activity, *i.e.*, work activity that involves significant physical or mental activities and is usually done for pay or profit.  Judge Pearce found Clark had not engaged in substantial gainful activity since December 11, 2009, the alleged date of onset of disability.  Although Clark had worked as a handyman since 2005, Judge Pearce found insufficient evidence to establish "substantial gainful activity."

Step two requires determination of whether the claimant has a medically determinable impairment that is severe, *i.e.*, an impairment which significantly limits one's ability to perform basic work activities, or a combination of impairments that is severe.  Where medical and other evidence establishes only a slight abnormality or combination of slight abnormalities that have no more than a minimal effect on one's ability to work, the impairment or combination of impairments will not be deemed severe.  Judge Pearce found Clark has severe impairments of coronary artery disease, insulin dependent diabetes mellitus, obesity, right rotator cuff tear, and left eye vision loss.

Step three requires determination of whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment or combination of impairments is of such severity and meets the duration requirement, the claimant is disabled; if it does not, the analysis continues to step four.  After considering listings for vision, ischemic heart disease, and diabetes, the ALJ found Clark's condition does not satisfy the criteria for those listings.

At the fourth step, the claimant's residual functional capacity and past relevant work are considered.  If the claimant can still do his past relevant work, he is not disabled.  Considering all Clark's symptoms and the extent to which they can reasonably be accepted as consistent with the objective medical evidence and other evidence, Judge Pearce that although Clark could not do his former work as an auto glass installer, he had the residual capacity to perform light work – excepting exposure to unprotected heights or hazardous machinery, climbing ladders or scaffolds, poorly lit work environments and temperature extremes – that he can reach with his dominant arm and balance, but cannot operate a motor vehicle at night.  While the ALJ found Clark's medically determinable impairments could reasonably be expected to cause his symptoms, he found Clark's statements regarding the intensity, persistence and limiting effects of the symptoms not credible to the extent that they are inconsistent with the residual functional capacity assessment.  In so finding, the ALJ noted Clark had been self-employed since 2005, had served as interim pastor for a church for almost two years, had been attending Bible college but had to drop out due to his vision because of the amount of reading and studying required.  The ALJ found Clark "maintains a level of activity that is inconsistent with total disability." [15, p. 19]  Inconsistencies between Clark's testimony regarding his limitations and his daily activities are relevant in the evaluation of his credibility.  *Reyes v. Sullivan*, 915 F.2d 151, 155 (5th Cir. 1990).  By his own testimony, even at the time of the hearing almost two years after he allegedly became disabled Clark was still working as a handyman painting and cleaning rental properties.  The ALJ pointed out other inconsistencies in the record which also support his finding that Clark was not wholly credible.

At the fifth step, the Commission must determine from the residual functional capacity, the claimant's age, education and work experience to determine whether the claimant can make

an adjustment to other work.  Judge Pearce found from the whole evidence, including that of the vocational expert, that Clark could make such an adjustment, and that there existed jobs which Clark could perform, such as storage rental clerk, information booth clerk and ticket seller. Judge Pearce therefore accordingly found Clark was not disabled as defined by the Act.

Clark does not complain of any error of law by the ALJ, and the Court's review of the record reveals none.  Clark objects instead to Judge Pearce's finding Clark not wholly credible; his findings based on conflicting evidence; the finding that Clark worked as an interim pastor, watched TV and drove (to which Plaintiff himself testified); and the finding that Clark's testimony regarding shortness of breath is inconsistent with the medical evidence.[9]  As stated above it is the Commissioner's prerogative to determine credibility of witnesses and resolve conflicts in the evidence, and the Court is required to accept the Commission's factual findings which are supported by substantial record evidence.  Evaluation of a claimant's "subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled."  *Harrell v. Bowen*, 862 F.2d 471, 480 (5th Cir. 1988)(citing *Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir. 1986); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983)).  Clark's complaint that he did not have Dr. Striegel's medical source statement at the time of his hearing is immaterial since the statement was received and considered by the Appeals Council, which held that it did not provide a basis for changing the ALJ's decision.  [15, p. 6].

## RECOMMENDATION

Having considered the entire record of the proceedings below and controlling law, the undersigned is of the opinion that the Commissioner's final decision is supported by substantial

---

[9]With respect to this claim, Plaintiff points out one mention of "poor inspiration" in the 318-page record, and that is in a medical record prepared immediately prior to his heart surgery in 2007 [15, p. 214], which was during the time he was working 6-8 hours a day, five days a week in construction and glass repair.  [15, pp. 179-80]

evidence and in accord with relevant legal standards.  Accordingly, the undersigned recommends that the decision of the Commissioner be affirmed.

**NOTICE OF RIGHT TO APPEAL/OBJECT**

Pursuant to Rule 72(a)(3), *Local Uniform Civil Rules of the United States District Courts for the Northern District of Mississippi and the Southern District of Mississippi* (Dec.1, 2011), after service of a copy of this Report and Recommendation, each party has fourteen days to serve and file with the Clerk any written objections to it.  Within seven days of service of objections, the opposing party must either serve and file a response or notify the District Judge that he does not intend to respond to the objection.  An objecting party must specifically identify the findings, conclusions, and recommendations to which he objects; the District Court need not consider frivolous, conclusive, or general objections.  A party who fails to file written objections to the proposed findings, conclusions, and recommendations within fourteen (14) days of being served a copy is barred, except upon grounds of plain error, from attacking on appeal any proposed factual finding or legal conclusion accepted by the District Court to which he did not object. *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

Signed, this the 9th day of June, 2014.

/s/ *Robert H. Walker*

ROBERT H. WALKER
UNITED STATES MAGISTRATE JUDGE